IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
December 1, 2009 Session

## STATE OF TENNESSEE v. ORLANDO DANIEL GARCIA

**Direct Appeal from the Circuit Court for Tipton County**
**No. 5551     Joseph H. Walker,  III, Judge**

_____

**No. W2009-00164-CCA-R3-CD  - Filed September 28, 2010**

_____

The defendant, Orlando Daniel Garcia, was convicted by a Tipton County jury of facilitation of first degree murder, a Class A felony, and possession of a Schedule VI controlled substance with intent to deliver, a Class E felony, and was sentenced to concurrent sentences of nineteen years and eighteen months for the respective convictions.  On appeal, the defendant has raised three issues for our review: (1) whether the evidence was sufficient to support the conviction for facilitation of first degree murder; (2) whether the trial court erred in admitting portions of a video tape of the crime into evidence; and (3) whether the trial court erred in admitting evidence that the defendant purchased and wore a shirt with a Superman logo shortly after the incident.  Following review of the record, we affirm the judgments of convictions.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which THOMAS T. WOODALL and J.C. MCLIN, JJ., joined.

William D. Massey and Lorna S. McClusky, Memphis, Tennessee, and C. Michael Robbins, Covington, Tennessee, for the appellant, Orlando Daniel Garcia.

Robert E. Cooper, Jr., Attorney General and Reporter; David H. Findley, Senior Counsel; D. Michael Dunavant, District Attorney General; James Walter Freeland, Jr. and P. Neal Oldham, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**Factual Background**

The defendant's convictions in this case arose from his involvement in the shooting death of Tennessee Highway Patrol Trooper Calvin Jenks. The nineteen-year-old defendant and his childhood friend, Alejandro Gauna, both residents of Austin, Texas, purchased marijuana in Texas, transported it to Tennessee, and planned to sell the drugs for a profit. The defendant stated that Gauna purchased several pounds of marijuana and brought it on the trip, but the defendant stated that he personally only brought a quarter pound with him. The two left Austin together in a rental car, which was procured by Gauna. Sometime during the trip, Gauna produced two guns and informed the defendant that they were to be used in the event someone attempted to rob them and "to not be afraid to pull the trigger." Gauna also made the statement to the defendant that if they were stopped by a police officer, they "might have to do him." Although the defendant later claimed that he was "shocked" by Gauna's statement, the two proceeded to Tennessee.

The pair arrived in Memphis and met with Tyler Thomas, a fifteen-year-old girl who was acquainted with Gauna's girlfriend. Thomas, who was also from Texas, was living in Millington at that time. Because she was looking for a ride back to Austin, she and Gauna had been texting regarding him taking her home. However, when the defendant and Gauna arrived, they did not immediately return to Texas as Thomas thought they would. Instead, after some failed attempts to sell the marijuana in the Memphis area, they informed her that they were going to Nashville in order to try and sell the drugs. The group proceeded to Nashville where they eventually checked into a motel. During their stay at the motel, Thomas saw two guns on a table and a large quantity of marijuana.

The next few days were spent driving around Nashville in an attempt to locate people to whom they could sell the marijuana. At some point during the trip, the group asked a man for driving directions to "the projects." The man warned them to be careful because "they cut throats" in the projects. They replied that they were prepared for that because they "were strapped." The group had little success but did manage to find a few people to purchase marijuana. During the drug transactions, which Gauna conducted, the defendant kept the .357 pistol in his lap. Thomas stated that Gauna was in control and appeared to make all the decisions regarding whom to sell the drugs. She stated that the defendant, whom she had never met prior to this trip, was a nice, calm, polite person. Unhappy with the amount of drugs they were able to sell, Gauna mentioned that they might need to rob a pawn shop because he did not want to return home empty-handed.

The group eventually departed Nashville to take Thomas back to Memphis, but the bulk of the marijuana was left in the motel room. Once in Memphis, the group made several stops, again seeking people to purchase drugs. Thomas phoned a friend to pick her up, and they agreed to meet at Jetway Market in Millington. The defendant, along with Gauna, drove Thomas to the gas station, where she was picked her by her friend. Shamus Pringle and

Marvin King were also in the parking lot at the time. Gauna offered them marijuana, which King smoked. The two also agreed to buy more marijuana from Gauna and exchanged numbers in order to facilitate a later transaction.

Shortly thereafter, the defendant and Gauna left the station and became lost. They stopped twice to ask for directions to Brownsville. The pair ended up on Highway 14, which was not a popularly traveled road at that time of night. The defendant was speeding, and Trooper Jenks proceeded to initiate a traffic stop. According to the defendant, he initially considered trying to outrun the officer because he knew there were marijuana and weapons in the car. Moreover, the defendant had lost his driver's license during the trip. Gauna asked the defendant what he wanted to do, and the defendant replied, "Let's see what happens." The defendant stopped the car on the side of the road. Trooper Jenks approached the car and was informed that the defendant had no license. At this point, he requested that the defendant exit the car and proceed to the rear of the vehicle. While there, Trooper Jenks told the defendant that he smelled marijuana and asked if there were drugs or weapons in the car. After initially denying the presence of either, the defendant, in response to the trooper's further questioning and urging to "do this the easy way," eventually informed the trooper that there was a blunt in the center console. When Trooper Jenks proceeded to the driver's side door and leaned into the car, Gauna shot him twice in the head. Gauna began yelling for the defendant to "Get him out. Get him out." The defendant then walked to the driver's side of the car, pulled the trooper's body from the car, and tossed it onto the roadway. The two men then sped off in the rental car. These events were all captured on video by Trooper Jenks' in-car camera, which activated when he turned on the blue lights.

Richard Berkley was raccoon hunting at the approximate time of the incident. While traveling home, he discovered Trooper Jenks' body lying in the roadway, although he initially mistook the body for that of a deer. He stopped, saw that the trooper was deceased, and called 9-1-1.

Meanwhile, the defendant and Gauna had gone to a local convenience store where Gauna entered and asked if they had Armor All wipes. Upon learning that they did not, he requested driving directions to the local Walmart. Video surveillance of the Walmart parking lot shows them driving into the parking lot and shows Gauna entering the store where he purchased the wipes. The two men then proceeded to use the wipes to clean inside of the car and to throw away two empty shells, as well as Trooper Jenks' flashlight. The defendant entered the store and purchased a shirt with a Superman logo on it. He then changed into the new shirt in the restroom and disposed of his blood-stained shirt in the trash. Gauna also entered the store and purchased new clothing. Surveillance video captured both men exiting the store, returning to the car, and leaving the parking lot.

Afterward, the two proceeded to "the projects" and abandoned the rental car. Gauna had called Pringle and King and asked them for a ride to Nashville. Gauna told them he would lower the price per pound of the marijuana in exchange for the ride. Pringle and King proceeded to Brownsville to pick up the two men, but they were detoured because a portion of Highway 14 was blocked. The two could see that several police cars were in the area. When they arrived in Brownsville, they met the defendant and Gauna at an apartment complex. Pringle did not see the car the defendant and Gauna had previously driven, and, when he asked where it was, Gauna responded that he did not "want to talk about it." They then left Brownsville and went to the motel room in Nashville. Both men testified that neither Gauna nor the defendant mentioned anything about shooting the officer and that both appeared relatively calm. When they arrived at the motel, Pringle accompanied the defendant and Gauna into the room. Gauna then pointed a gun at him and told him to take the marijuana without payment. Once the transaction was complete, Pringle left the room, and the defendant followed him to his car. Pringle and King then left and began their trip back to Memphis. However, police subsequently stopped the two men for a traffic violation. The officer saw the marijuana, arrested Pringle and King, and took them to a local police station, where they were questioned by TBI agent Joe Craig. Upon learning about the shooting, the two men eventually told officers where they had purchased the marijuana and that the defendant and Gauna might be involved.

Meanwhile, after Pringle and King left the motel room, the defendant and Gauna cleaned up and then, at the defendant's suggestion, left the room in order to dispose of the weapons. The pair called a cab and went to a nearby Wendy's where they disposed of the guns in the dumpster. The defendant and Gauna then ate and returned to the motel room.

The next morning, based upon the information obtained from Pringle and King, TBI agents went to the motel and ascertained where the defendant and Gauna were staying. The two were arrested and questioned separately by officers. The defendant gave a statement to officers indicating that Gauna was the shooter. Nonetheless, no mention was made of the gun which the defendant had possessed. No guns were found in the motel room that had previously been occupied by the defendant and Gauna. However, police did find a cell phone, in addition to the one in Gauna's possession, 58.7 grams of marijuana, and .4 grams of crack cocaine. The defendant was then transported to TBI headquarters and gave a second statement in which he gave conflicting statements regarding his knowledge of the murder weapon. The defendant eventually revealed that two guns had been present in the car and indicated to police that he and Gauna had disposed of them at a nearby Wendy's. The two guns were recovered, and it was determined that the weapon used to shoot Trooper Jenks was the .22 caliber pistol.

Police officers still investigating the incident in Brownsville were called to the local Walmart. There, officers recovered Trooper Jenks' flashlight, a bloody towel, and spent bullet casings from a trash can. Officers also collected a piece of bloodstained paper which contained addresses of night life places in Nashville. Officers viewed Walmart's surveillance video and determined that the two men seen on the video from Trooper Jenks' car were the two men captured in the Walmart security footage. The defendant was seen entering the store and, shortly thereafter, a logo shirt was purchased, as determined through register transaction records. The Walmart video showed the defendant as he exited the store wearing a new shirt which had a Superman logo on it. The shirt he wore into Walmart was recovered from the trash, and it was determined that Trooper Jenks' blood was present on the shirt. A Superman tag was also recovered from the trash. Police later found the rental car with Texas plates where the defendant and Gauna had abandoned it. The recovering officer noted the presence of blood in the driver's seat, which was also determined to be Trooper Jenks' blood.

Based upon the foregoing acts, the defendant was indicted by a Tipton County grand jury for one count of criminal responsibility for premeditated first degree murder and one count of unlawful possession of marijuana with intent to deliver. The State presented evidence at a jury trial to establish the above facts, which included the video of the incident, video recordings from local gas stations and Walmart, testimony from multiple police officers, the defendant's various statements, and testimony from Thomas, Pringle, and King. The defendant also elected to testify in his own defense. He acknowledged that Gauna had, in fact, shot and killed Trooper Jenks and that he had been present at the time. However, he maintained that he was not aware that Gauna was going to shoot the officer. According to the defendant, he was "surprised" and "scared" after the shooting but maintained that he was too scared to say anything or turn Gauna in to law enforcement. He also testified that Gauna was in charge of the drug operation and that he was not sharing in the profits. After hearing the evidence, the jury convicted the defendant of the lesser included offense of facilitation of first degree murder and possession with intent to deliver marijuana. The defendant was later sentenced to concurrent sentences of nineteen years and eighteen months for the respective convictions. Following the denial of his motion for new trial, the defendant filed the instant timely appeal.

**Analysis**

On appeal, the defendant has raised three issues for our review. First, he contends that the evidence was not sufficient to support the conviction for facilitation. He also raises two evidentiary issues: (1) whether the court erred in failing to exclude from evidence portions of a video depicting events after the shooting; and (2) whether the court improperly admitted

evidence that the defendant purchased and wore a Superman logo shirt shortly after the shooting.

## I.  Sufficiency of the Evidence

First, the defendant contends that the evidence is insufficient with regard to his conviction for facilitation of first degree murder.  In considering the issue of sufficiency of the evidence, we apply the rule that where the sufficiency of the evidence is challenged, the relevant question for the reviewing court is "whether, after viewing the evidence in the light most favorable to the [State], *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also* Tenn. R. App. P. 13(e).  Moreover, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. *State v. Harris*, 839 S.W.2d 54, 75 (Tenn. 1992).  All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact.  *State v. Pappas*, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987).  This court will not reweigh or reevaluate the evidence presented.  *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978).

"A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973).  A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt so that, on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).  These rules are applicable to findings of guilt predicated upon direct evidence, circumstantial evidence, or a combination of both.  *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990).

Although a conviction may be based entirely upon circumstantial evidence, *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1974), in such cases, the facts must be "so clearly interwoven and connected that the finger of guilt is pointed unerringly at the Defendant and the Defendant alone." *State v. Black*, 815 S.W.2d 166, 175 (Tenn. 1991) (citing *State v. Duncan*, 698 S.W.2d 63 (Tenn. 1985)).  However, as in the case of direct evidence, the weight to be given circumstantial evidence and "the inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury." *Marable v. State*, 203 Tenn. 440, 313 S.W.2d 451, 457 (Tenn. 1958) (citations omitted).

As noted, the defendant was convicted of facilitation of first degree premeditated murder.  "A person is criminally responsible for the facilitation of a felony if, knowing that

another intends to commit a specific felony, but without the intent required for criminal responsibility under [section] 39-11-402(2), the person knowingly furnishes substantial assistance in the commission of the felony." T.C.A. § 39-11-117(a)(1), -403(b) (2006). The defendant specifically challenges each element and argues that "[t]here was no evidence at trial that the Defendant *knew* that Gauna was going to kill Trooper Jenks nor was there evidence that the Defendant took affirmative actions to substantially assist in the murder."

We first address the defendant's contention that there was no evidence that he knew that Gauna was going to murder Trooper Jenks. We agree with the defendant that there is no direct evidence which establishes his guilt, as is often the case in situations such as these where the actions and inner communications of the principals involved would be needed to supply actual details of their knowledge. However, his argument ignores that elements of an offense may also be established by circumstantial evidence and the inferences derived from the actions of the party or parties involved. Indeed, in this case, the defendant's actions at the time of the murder were captured on video and stand in contrast to his testimony that he was "surprised" and "scared" when Gauna fired the weapon. The video captures the trooper asking the defendant if he had any guns or drugs in the car. The defendant responded negatively. The defendant eventually acknowledged that drugs were present, but he never informed Trooper Jenks that he was approaching a car with two loaded weapons inside. From his calm demeanor after the shooting, the jury could have formed an inference that the defendant was not shocked or surprised by Gauna's actions, which could indicate he was expecting it to occur. After the shots were fired, the defendant immediately walked to the front of the car, removed Trooper Jenks' body, got into the car, and quickly drove away. Additionally, the events which then unfolded belie the defendant's contention that he was "shocked" and "scared." They first went to a convenience store and then to a Walmart; they then methodically cleaned the car and disposed of all evidence of the murder. The defendant was left alone multiple times and never once sought to distance himself from Gauna or seek help from law enforcement.

The inference is further supported by the actions of Gauna and the defendant in the days prior to the shooting. The two left Texas, armed with two guns, and sought to actively engage in illegal drug trafficking. While Gauna was apparently the ringleader of the enterprise, the evidence presented, including the defendant's own statements, indicate that he was involved. He drove the vehicle and had possession of a weapon during the transactions. Moreover, Gauna specifically made statements indicating that he was prepared to commit acts of violence if necessary, *i.e.*, that if they were stopped by a law enforcement officer "they might have to do him" and that they might have to rob a pawn shop. While the defendant indicated that he did not believe that Gauna would actually commit these acts, it is the jury who is responsible for judging the credibility of the witnesses. Clearly, in this case, they found the defendant's credibility lacking, and it is not the province of this court

to reevaluate such determinations. After review, we conclude that the evidence, taken together, of the video, the defendant's statements, and his actions following the crime undermine the defendant's assertion that he was "surprised" by Gauna's murder of Trooper Jenks. Thus, the element of the knowledge is established.

The defendant also contends that there is no evidence that he provided substantial assistance in the murder of Trooper Jenks. He asserts that the defendant only complied with the trooper's request and "did not take any affirmative actions, plan the crime, stand as a lookout, or otherwise assist Gauna in killing the trooper." He asserts that "at worst[, the defendant] failed to warn the trooper that there were guns in the vehicle," which cannot constitute substantial assistance. However, the record establishes not just a failure to warn Trooper Jenks of the presence of the guns but an affirmative statement by the defendant that no weapons were present. While the defendant recanted his earlier statement that no drugs were in the vehicle, he never corrected his statement that no weapons were present. As noted by the State in its brief, this allowed Trooper Jenks to approach the vehicle without a weapon drawn, believing that it was safe for him to enter the car. This assisted Gauna in the murder, as it allowed him to maintain the element of surprise and kill the trooper. It was reasonable for the jury to infer that, but for the affirmative representation by the defendant that no weapons were present, he would not have approached the car with Gauna inside. Thus, the jury could have inferred that if the trooper had not approached the car, he would not have been shot. As such, the defendant's actions did, in fact, provide substantial assistance to Gauna in committing first degree murder.

Furthermore, we are not constrained, as the defendant asserts in his argument, to consider only the defendant's affirmative action of lying regarding the presence of the guns in the car to establish substantial assistance. Rather, we again look to all the defendant's actions prior to the murder of Trooper Jenks to establish the substantial assistance element. As noted, the defendant and Gauna left Texas with the expectation of engaging in the dangerous criminal enterprise of selling illegal drugs, which ultimately resulted in the death of the trooper. The two were armed with guns, and the defendant was actively providing substantial assistance to Gauna in conducting these transactions. By his own admission, the defendant drove the car and armed himself in order to provide protection to them during the time the sales were made. Based upon the actions of the defendant and the admitted comments made by Gauna to him, it is reasonable to conclude that the defendant was aware of the danger involved and willing to perpetrate actions to protect their enterprise. We would conclude that the murder of Trooper Jenks was merely a further step in this criminal activity which both the defendant and Gauna perpetrated from the time the two left Texas. Accordingly, we conclude that the evidence is sufficient to support the conviction.

As an aside, we note that there is no need to address the defendant's separate contention that the evidence is also insufficient to support the lesser offenses of second degree murder and voluntary manslaughter in light of the jury's rejection of the State's theory of criminal responsibility. He appears to raise this argument in the context of possible inconsistent verdicts in the event that this court found the evidence insufficient for the facilitation conviction and a retrial resulted. As we have concluded that the evidence supports the facilitation conviction, it is not necessary to address this contention.

## II. Evidentiary Issues

### (a). Video Tape

The defendant argues that the trial court erred by failing to exclude the portion of the video tape which depicted the events after the shooting and the defendant's flight from the scene. As stated, the video tape in question captured the entire incident from the time Trooper Jenks activated his blue lights until law enforcement arrived on the scene. According to the defendant, the probative value of the entire video tape is slight, but he particularly complains about the portions of the video which depicted the events following the defendant's leaving the scene, namely Trooper Jenks body lying on the roadway for several minutes and Mr. Berkely's discovery of the body.

A trial court is entitled to broad discretion when admitting evidence at trial, and only upon a showing of an abuse of that discretion in admitting evidence will a defendant be entitled to a new trial. *State v. Robinson*, 146 S.W.3d 469, 490 (Tenn. 2004). The trial court's exercise of discretion may not be reversed unless the court "applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining." *State v. Shuck*, 953 S.W.2d 662, 669 (Tenn. 1997). A prerequisite to the admission, however, is that it must be relevant to an issue that the jury must decide before it may be properly admitted. *State v. Vann*, 976 S.W.2d 93, 102 (Tenn. 1998). Furthermore, the probative value of the evidence must outweigh any unfair prejudicial effect that it may have upon the trier of fact. *Id*. at 102-03. Even though photographs or videos of crime victims who suffer serious bodily injury could be viewed as prejudicial by their very nature, they are not *per se* excludable. Only evidence which is unfairly prejudicial and has an undue tendency to suggest a decision on an improper basis will be excluded. *Banks*, 564 S.W.2d 947, 959-53 (Tenn. 1978).

According to the defendant, the portions of the video which depict Trooper Jenks' lifeless body lying on the roadway for a length of time prior to his discovery and the subsequent discovery by Mr. Berkely are "only prejudicial and offered no probative value." He complains that the trial court's actions of directing the State to fast-forward the tape

during the extended time frame these events occurred was not sufficient, as the jury was still allowed to see "the body of Trooper Jenks laying lifeless on the roadway for an extended period of time." He further argues that, because Mr. Berkely was available to testify at trial, there was no need to watch his arrival and discovery of the body on video, "especially when doing so essentially allowed the State to show the jury the gruesome image of the trooper's lifeless body on the roadway." He contends that the State employed a strategy which "can only be seen as designed to inflame the jury against the" defendant.

With regard to the twenty-minute portion of the tape which shows the trooper on the roadway, the defendant objected at trial to the jury having to watch the entire length of the footage. It was the defendant's request that the court fast-forward the video to the point when the body was discovered. He cannot now complain that it should not have been shown at all when the court gave him the relief which he requested. Moreover, as pointed out by the State, the entire video, up to the point of discovery of the body, was relevant. The State bears the burden of proof in all cases, and here they had to show that the crime scene was not altered. Additionally, it was relevant in that it helped establish a time frame of the crime and discovery in comparison to the defendant and Gauna's subsequent actions. We conclude that the court did not err in allowing this portion of the video into evidence. Additionally, we note that we cannot conclude that the jury was unduly swayed by emotion caused from watching the video in light of the fact that they returned a verdict as to a lesser offense. This indicates consideration of the evidence rather than sympathy. As such, even if error had occurred, it would be harmless. Tennessee Rules of Appellate Procedure 36(b) provides that "[a] final judgment from which relief is available and otherwise appropriate shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process." Based on the entire record, we cannot conclude that the outcome of the trial was affected by this portion of the video complained of by the defendant.

**(b) Defendant's Purchase of a "Superman" T-shirt**

Finally, the defendant complains that the trial court improperly admitted evidence that he purchased and wore a Superman shirt shortly after the shooting. He asserts that it was error and highly prejudicial under Tennessee Rules of Evidence 403 to allow the admission and, further, to allow the State to use the information in closing argument to establish this "after-the-fact behavior . . . [to] suggest the Defendant's intent."

As previously noted, a trial court is entitled to broad discretion when admitting evidence at trial, and their ruling may only be disturbed upon a showing of an abuse of discretion. *Robinson*, 146 S.W.3d at 490. As also noted, pursuant to Tennessee Rules of Evidence 403, evidence must be relevant to be admissible. Relevant evidence is "evidence

having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Relevant evidence may be excluded by the trial court if its probative value is substantially outweighed by the danger of unfair prejudice. Tenn. R. Evid. 403. "Unfair prejudice" has been defined as "[a]n undue tendency to suggest decision on an improper basis, commonly . . . an emotional one." *State v. Banks*, 564 S.W.2d 947, 951 (Tenn. 1978). However, the exclusion of relevant evidence under Rule 403 is an extraordinary remedy to be used only sparingly, and persons seeking to exclude evidence that would otherwise be admissible and relevant have a significant burden of persuasion. *State v. James*, 81 S.W.3d 751, 757-58 (Tenn. 2002).

According to the defendant, the fact that the jury was allowed to hear that he purchased and wore this Superman shirt and the State's references to the shirt in closing suggests decision on an improper basis and were "clearly designed to appeal to the jury's basest instincts." He further argues that "[t]he shirt cast the Defendant as a cop-killer with a sense of invulnerability and power, inviting the jury to speculate as to the character of the Defendant." He continues that "[t]he evidence of the Superman logo shirt was immaterial, unfairly prejudicial and should have been excluded from evidence."

Initially, we note that we must agree with the State that the defendant failed to raise this argument at trial, which could result in waiver of the issue. *See State v. Hall*, 8 S.W.3d 593, 603 (Tenn. 1999). A review of the record reveals that the defendant only objected at trial to admission of the price/logo tag which was discarded by the defendant in the restroom. We can find no objection to the fact that the defendant purchased or was seen wearing the shirt. Nonetheless, because the record is more than sufficient and in the interest of finality for the defendant, we elect to review the issue.

We disagree with his assertion that the fact that the defendant entered Walmart and purchased a Superman shirt is not relevant to any issue before the jury. As pointed out by the State, it could certainly been seen as going to the defendant's intent with regard to the crime. There is no dispute that a defendant's actions after committing a crime are relevant for the purposes of proving intent. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). The State bore the burden in this case of negating the defendant's statement that he was "surprised" and "scared" following the shooting. The fact that he purchased this particular shirt, along with his subsequent actions, could support an inference to the contrary. The State likens the defendant's choice of shirt in this case to a defendant's braggadocio to his friends regarding his criminal exploits, which has previously been held relevant to show intent. *See State v. Pike*, 978 S.W.2d 904 (Tenn. 1998). As pointed out by the defendant, the shirt suggested "a sense of invulnerability," which would definitely belie his assertions of surprise and fright which he placed before the jury.

Moreover, we cannot conclude that the evidence was unduly prejudicial. As previously noted, the jury clearly considered the evidence presented and reached a decision on the facts, as opposed to emotion, as evidenced by the verdict to a lesser offense. Additionally, we fail to see how the defendant could be prejudiced by the State's reference to his wearing of the shirt when the defendant admitted in his statements that he purchased it himself. Furthermore, the defendant is seen wearing the shirt in the Walmart surveillance video, which clearly was admissible. As such, we find it was not error to admit this evidence.

## CONCLUSION

Based upon the foregoing, the judgments of conviction imposed by the Tipton County Circuit Court are affirmed.

_____
JOHN EVERETT WILLIAMS, JUDGE